1    Steve W. Berman (*pro hac vice forthcoming*)
     Shelby Smith (*pro hac vice forthcoming*)
2    HAGENS BERMAN SOBOL SHAPIRO LLP
     1918 Eighth Avenue, Suite 3300
3    Seattle, WA 98101
     Telephone: (206) 623-7292
4    Facsimile: (206) 623-0594
     Email: steve@hbsslaw.com
5    Email: shelbys@hbsslaw.com

6    Shana E. Scarlett (SBN 217895)
     HAGENS BERMAN SOBOL SHAPIRO LLP
7    715 Hearst Avenue, Suite 202
     Berkeley, CA 94710
8    Telephone: (510) 725-3000
     Facsimile: (510) 725-3001
9    shanas@hbsslaw.com

10   *Attorneys for Plaintiffs and*
     *the Proposed Classes*

11   [Additional counsel on signature page]

12

13                          UNITED STATES DISTRICT COURT

14                         NORTHERN DISTRICT OF CALIFORNIA

15                                SAN JOSE DIVISION

16   MICHAEL JASPER, KEVIN PRESSER,          No. 5:17-cv-06284
     SUREN MANUKYAN, and KYVAN SHAIGI-
17   NEIK, individually and on behalf of all others   CLASS ACTION
     similarly situated,
18                                            JURY TRIAL DEMANDED
                          Plaintiffs,
19
             vs.
20
     GENERAL MOTORS LLC,
21
                          Defendant.
22

23                        **CLASS ACTION COMPLAINT**

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................1

II.   JURISDICTION ............................................................................................3

III.  VENUE ............................................................................................................3

IV.   PARTIES .......................................................................................................4

    A.    Plaintiffs .............................................................................................4

        1.    Michael Jasper ......................................................................4

        2.    Kevin Presser ........................................................................5

        3.    Suren Manukyan ...................................................................6

        4.    Kyvan Shaigi-Neik ...............................................................8

    B.    Defendant ............................................................................................9

V.    FACTUAL ALLEGATIONS .......................................................................9

    A.    Track enthusiasts share a passion for racing their vehicles on closed tracks. .............9

    B.    Specialized race tracks create safe conditions for track enthusiasts to pursue their passion. ............................................................................10

    C.    "Track-proven" vehicles operate under extreme conditions and must meet certain basic safety features to operate on a race track. ...........................10

        1.    Transmission systems in "track-proven" vehicles .........................10

        2.    Differentials in "track-proven" vehicles .......................................11

    D.    The Z06 was marketed as if it could operate on race tracks because GM knew this was material to potential buyers. ...............................................11

        1.    The product information materials promoted track use. ...............11

        2.    The features on the Z06 are those one would expect in a track-ready car. ......................................................................................14

        3.    The Z06 Owner's Manual contemplates track use. .......................14

        4.    Press kits were created by GM to entice track enthusiasts to purchase a Z06. ....................................................................................18

        5.    GM sponsored track events to demonstrate the "track-readiness" of the Z06. ......................................................................................19

E.    The Z06 cannot be safely raced on the track due to design and manufacturing defects in the cooling system. ..................................................................19

    1.    The nature of the defects and their safety consequences ...............................19

    2.    The economic consequences associated with the defects .............................21

F.    GM was aware of the defects in the Z06 while marketing them as "track-proven." ...................................................................................................22

    1.    GM concealed the fact that the Z06 was not fit for the track. .......................22

    2.    GM admits that the Z06's cooling system was defective. .............................22

    3.    GM had knowledge of the defects from consumer complaints. ....................22

G.    Despite express warranties, GM has not fixed the problems with the "track-proven" powertrain system. ...........................................................28

VI.    CLASS ALLEGATIONS ........................................................................................30

VII.    CLAIMS FOR RELIEF ..........................................................................................32

COUNT ONE VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301 *ET SEQ.*) ...........................................................................................32

COUNT TWO VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTY (CAL. CIV. CODE §§ 1791.2 & 1793.2(D)) AND BREACH OF COMMON-LAW EXPRESS WARRANTY .......................................34

COUNT THREE FRAUDULENT CONCEALMENT ..................................................................35

COUNT FOUR UNJUST ENRICHMENT ....................................................................................38

COUNT FIVE VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*) ...........................................................................39

COUNT SIX VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*) ...........................................................................40

COUNT SEVEN VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750 *ET SEQ.*) .....................................................................42

REQUEST FOR RELIEF .................................................................................................43

DEMAND FOR JURY TRIAL .........................................................................................44

Plaintiffs Michael Jasper, Kevin Presser, Suren Manukyan, and Kyvan Shaigi-Neik, individually and on behalf of all others similarly situated (the "Class"), allege the following:

## I.     INTRODUCTION

1.     "**Track-Proven Structure and Technologies**." That is what General Motors told potential race-enthusiast customers to entice them to buy its 2015, 2016, and 2017 Corvette Z06. The Z06s were far from ready for the track, however; in fact, they proved to be unreliable there. When a Z06 driver takes their car to the track, he or she learns that after fifteen minutes or less, the Z06 overheats, often causing the car to go into "Limp Mode" at drastically reduced speed and power—an obviously dangerous event when surrounded by speeding cars. The Z06 overheats and goes into Limp Mode because, despite its claims that the Z06 is made for the track, GM chose to equip the Z06 with a defective cooling system. This defect manifests in the "track" car's inability to withstand the demands of race track driving.

2.     There are certain basic rules that all carmakers must follow. When a carmaker sells a car, it has a duty to ensure that the car functions properly and safely for its advertised use and is free from defects. When a carmaker discovers a defect, it must disclose the defect and make it right or cease selling the car. And when a carmaker provides a warranty, it must stand by that warranty.This case arises from GM's breach of these rules. GM deceived its customers when it sold or leased the Z06s while promising that they were built for the track, when in fact they were unreliable and unsafe for that purpose.

3.     GM proclaimed that the Z06 had "track-proven structure and technologies" and explained how the Z06 was "conceived on the track":

A driver's car with no equal
Z06 is a true world-class supercar. Conceived on the track and engineered alongside the C7.R race car, Z06 features a lightweight and rigid aluminum space frame, as well as a supercharged 6.2L aluminum V8 engine delivering 650 horsepower and 650 lb.-ft. of torque.

STARTING AT: $79,450*
AS SHOWN: $84,010*

4.      As GM intended, Plaintiffs and Class members purchased Z06s for road and track use at prices from $80,000 to $120,000. More than 30,000 Z06s have been sold nationwide. But Z06s are not fit for track use due to an ineffective cooling system. This defect results in the powertrain overheating when used on the track, sometimes sending the car into Limp Mode, which is a dangerous condition on a race track full of speeding cars. In addition to manifesting on the race track, the defect also activates the dangerous Limp Mode or overheats in non-track driving conditions.

5.      Customer experiences with the Z06 on the track differ dramatically from GM's promise of a track vehicle and their testimonials chronicle the activation of Limp Mode or the driver having to pull off the track to let the engine cool down. Z06 forums and GM customer service files are replete with complaints from consumers who reasonably believed that their Z06 would in fact be fully track-capable—instead, they have been put at risk of accident on race tracks and during non-track driving when the defective transmissions and rear differentials overheat, causing the cars to go into Limp Mode at drastically reduced speed and performance or forcing the driver to stop in order to protect the engine.

6.     In addition, because the Z06 runs at such high temperatures, and particularly when it overheats, the engine is damaged due to warping from these high temperatures.

7.     GM is aware of the defect and suspended production of the Z06 for a period of time to find a solution to the overheating issue, which it intended to incorporate in the 2017 Z06. GM claimed to have fixed the problem in the 2017 model by switching to a new hood with larger vents and a new supercharger cover. However, this fix does not help consumers with previous models and does not fix the problem. The 2017 still overheats and GM's only answer is to, after the fact, warn owners that automatic transmissions have the potential for overheating.

8.     But GM cannot shift its warranty obligations onto its customers. If the Z06s need a different cooling system to actually perform as advertised, then GM should retrofit the cars with these components on its 2015 and 2016 models as well as fix the 2017 model to allow the car to perform as promised. Additionally, GM should address and remedy the problems to the engine, transmission, drivetrain, and other parts that occur as a result of these unintended overheating issues.

9.     Plaintiffs bring this action individually and on behalf of the Class described below. Plaintiffs seek damages and other equitable relief.

## II.     JURISDICTION

10.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a) because Plaintiffs are citizens of California and General Motors LLC is a citizen of Delaware (where it is incorporated) and Michigan (where it has its principal place of business), and the matter in controversy for each plaintiff exceeds the sum of $75,000, exclusive of interest and costs.

## III.     VENUE

11.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions and/or misrepresentations giving rise to Plaintiffs' claims occurred in this District. Plaintiff Michael Jasper took delivery of his Z06 in this District, and GM has marketed, advertised, sold, and leased Z06s within this District.

# IV.     PARTIES

**A.     Plaintiffs**

    **1.     Michael Jasper**

    12.     Plaintiff Michael Jasper is an individual residing in Sunnyvale, California, and is a citizen of California. On September 11, 2015, Mr. Jasper leased a 2016 Chevrolet Corvette Z06 Z07 package from Courtesy Chevrolet, an authorized GM dealer in San Jose, California, for $130,080. Mr. Jasper leased the vehicle for both road and track use.

    13.     Unknown to Mr. Jasper at the time he leased the vehicle, the Corvette Z06 suffered from defects, which has caused him out-of-pocket loss associated with the cooling defect, attempted and future attempted repairs, and diminished value of the vehicle. GM knew about these defects but did not disclose the defects to Mr. Jasper, so he leased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable and that the vehicle was intended to be a vehicle that could be used on the track or at high speeds and was capable of safely performing these operations.

    14.     Mr. Jasper selected and ultimately leased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced. Mr. Jasper reviewed print and online advertisements showing photographs of the 2016 Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. None of the information reviewed by Mr. Jasper contained any disclosure relating to any defects in the 2016 Corvette Z06 or that the 2016 Corvette Z06 was unreliable and unsafe when used on the track.

    15.     Mr. Jasper's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. If GM had disclosed to Mr. Jasper that his vehicle's cooling system suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have leased the vehicle or he would have paid less for it.

16.     Mr. Jasper planned to use his 2016 Corvette Z06 on the road and on the track but stopped taking it to the track after his vehicle overheated and went into limp mode on the track after one lap. When Mr. Jasper told the service manager at the dealership about it, he said they did not know what to do. The service manager also told Mr. Jasper that if he modified the car in any way to fix the overheating, his warranty would be void. Due to GM's failure to disclose the cooling defect, Mr. Jasper was denied the benefit of the bargain at the time of sale and paid a premium for a vehicle that he would have not have. Mr. Jasper has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

**2.     Kevin Presser**

17.     Plaintiff Kevin Presser is an individual residing in Anaheim, California, and is a citizen of California. On October 31, 2015, Mr. Presser purchased a new 2015 Chevrolet Corvette Z06 3LZ from Allen Gwynn Chevrolet, authorized GM dealership in Glendale, California, for approximately $91,000. The vehicle is covered by a manufacturer's warranty. Mr. Presser purchased the vehicle for both road and track use.

18.     Mr. Presser purchased and still owns this vehicle. Unknown to Mr. Presser at the time he purchased the vehicle, the Corvette Z06 suffered from defects, which has caused him out-of-pocket loss associated with the cooling defect, attempted and future attempted repairs, and diminished value of the vehicle. GM knew about these defects but did not disclose the defects to Mr. Presser, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable and that the vehicle was intended to be a vehicle that could be used on the track or at high speeds and was capable of safely performing these operations.

19.     Mr. Presser selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced. Mr. Presser reviewed print and online advertisements showing photographs of the Corvette Z06 on race tracks and read about how various components in all 2015 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. None of the

information reviewed by Mr. Presser contained any disclosure relating to any defects in the Corvette Z06 or that the Corvette Z06 was unreliable and unsafe when used on the track.

20.    Mr. Presser's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. If GM had disclosed to Mr. Presser that his vehicle's cooling system suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

21.    During a Track Day event at Mazda Raceway/Laguna Seca, Mr. Presser's 2015 Corvette Z06 overheated after fifteen minutes and went into limp mode. When he brought the issue to the attention of his servicing dealer at Keyes Chevrolet-Van Nuys, they stated no knowledge of any issues. Subsequent track sessions had to be at a reduced pace while watching the engine/transaxle temperatures closely. Recently, Mr. Presser's Corvette Z06 overheated when he was driving in normal traffic on dangerous mountain roads on the way to Big Bear. When the vehicle overheated, Mr. Presser got a warning to turn off the AC and a message that said "service power steering" and "drive safely."

22.    Due to GM's failure to disclose the cooling defect, Mr. Presser was denied the benefit of the bargain at the time of sale and paid a premium for a vehicle that he would have not have. Mr. Presser has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

**3.    Suren Manukyan**

23.    Plaintiff Suren Manukyan is an individual residing in Canyon Country, California, and is a citizen of California. On September 4, 2016, Mr. Manukyan purchased a 2016 Chevrolet Corvette Z06 3LZ with the Z07 track package from AutoNation Chevrolet Valencia, an authorized GM dealer in Valencia, California, for $116,590.36. Mr. Manukyan purchased the vehicle for both road and track use.

24.    Unknown to Mr. Manukyan at the time he purchased the vehicle, the Corvette Z06 suffered from defects, which has caused him out-of-pocket loss associated with the cooling defect,

attempted and future attempted repairs, and diminished value of the vehicle. GM knew about these defects but did not disclose the defects to Mr. Manukyan, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable and that the vehicle was intended to be a vehicle that could be used on the track or at high speeds and was capable of safely performing these operations.

25.    Mr. Manukyan selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced. Mr. Manukyan reviewed print and online advertisements showing photographs of the 2016 Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. None of the information reviewed by Mr. Manukyan contained any disclosure relating to any defects in the 2016 Corvette Z06 or that the 2016 Corvette Z06 was unreliable and unsafe when used on the track.

26.    Mr. Manukyan's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. If GM had disclosed to Mr. Manukyan that his vehicle's cooling system suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

27.    About six months after Mr. Manukyan purchased his 2016 Corvette Z06, he took the car on a spirited drive from his home to the local mountains. About fifteen minutes into the drive, Mr. Manukyan noticed a substantial increase in both coolant and oil temperature and a loss of engine power. He had to turn around and return back home.

28.    Mr. Manukyan planned to use his 2016 Corvette Z06 on the road and on the track but ever since that day he has been reluctant to enjoy the car to its fullest without fear that he may damage the engine or void the warranty. Due to GM's failure to disclose the cooling defect, Mr. Manukyan was denied the benefit of the bargain at the time of sale and paid a premium for a

1    vehicle that he would have not have. Mr. Manukyan has also suffered additional damage relating to

2    the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

3         **4.    Kyvan Shaigi-Neik**

4         29.    Plaintiff Kyvan Shaigi-Neik is an individual residing in Mission Viejo, California,

5    and is a citizen of California. On February 9, 2016, Mr. Shaigi-Neik purchased a new 2016 Chevrolet

6    Corvette Z06 from Selman Chevrolet, an authorized GM dealer in Orange, California, for $104,850.

7    The vehicle is covered by a manufacturer's warranty. Mr. Shaigi-Neik purchased the vehicle for both

8    road and track use.

9         30.    Mr. Shaigi-Neik purchased and still owns this vehicle. Unknown to Mr. Shaigi-Neik

10   at the time he purchased the vehicle, the Corvette Z06 suffered from defects, which has caused him

11   out-of-pocket loss associated with the cooling defect, attempted and future attempted repairs, and

12   diminished value of the vehicle. GM knew about these defects but did not disclose the defects to

13   Mr. Shaigi-Neik, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle

14   would be safe and reliable and that the vehicle was intended to be a vehicle that could be used on the

15   track or at high speeds and was capable of safely performing these operations.

16        31.    Mr. Shaigi-Neik selected and ultimately purchased his vehicle, in part, because the

17   Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever

18   produced. Mr. Shaigi-Neik reviewed print and online advertisements showing photographs of the

19   Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were

20   "track-proven," such as the suspension, special steering, special brakes, and specific software

21   settings, including a "Track App" and a heads-up tachometer display used for racing. None of the

22   information reviewed by Mr. Shaigi-Neik contained any disclosure relating to any defects in the

23   Corvette Z06 or that the Corvette Z06 was unreliable and unsafe when used on the track.

24        32.    Mr. Shaigi-Neik's vehicle was equipped with items a reasonable consumer would

25   believe to be present in a vehicle to be used on a track, including special suspension, special steering,

26   special brakes, and specific software settings, including a "Track App" and a heads-up tachometer

27   display used for racing. If GM had disclosed to Mr. Shaigi-Neik that his vehicle's cooling system

28

suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

33.    Mr. Shaigi-Neik planned to use his 2016 Corvette Z06 on the road and on the track but stopped taking it to the track after his vehicle overheated and went into limp mode on the track during his first visit to the track. Due to GM's failure to disclose the cooling defect, Mr. Shaigi-Neik was denied the benefit of the bargain at the time of sale and paid a premium for a vehicle that he would have not have. Mr. Shaigi-Neik has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

**B.    Defendant**

34.    General Motors LLC is a corporation doing business in all 50 states and the District of Columbia, and is organized under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan. At all times relevant to this action, GM manufactured, sold, leased, and warranted the Z06s at issue throughout the United States. GM and/or its agents designed, manufactured, and installed the defective cooling systems in the Z06s. GM also developed and disseminated the owner's manuals, supplements, and warranty booklets, advertisements, and other promotional materials relating to the Z06s, and provided these to GM's authorized dealers for the express purpose of having these dealers pass such materials to potential purchasers. GM also created, designed, and disseminated information about the track capabilities of the Z06 to various agents of various publications for the express purpose of having that information reach potential consumers.

**V.    FACTUAL ALLEGATIONS**

**A.    Track enthusiasts share a passion for racing their vehicles on closed tracks.**

35.    There is a segment of car purchasers who buy cars that are designed to be used, in part, on race tracks. Often called "track enthusiasts," these car purchasers are passionate about motorsports and relish a challenging driving experience. Track enthusiasts often purchase their enthusiast vehicle so that they can drive on public roads as well as specialized race tracks. The Z06 has been heavily advertised as track-capable and GM aggressively markets the Z06 to track enthusiasts.

**B.**   **Specialized race tracks create safe conditions for track enthusiasts to pursue their passion.**

36.     Track enthusiasts purchase race cars to drive on closed race tracks. There are dozens of race tracks across the United States where track enthusiasts are allowed to bring their Z06 and operate them at very high speeds on closed tracks that are sealed off from all other highways and roads. A track enthusiast purchases time at a track—usually in thirty-minute increments—and drives on the track with other cars also racing at the same time. Typically, these race tracks provide a safe and welcoming environment for participants to explore the capabilities and limits of their high-performance sports cars while improving their driving skills. Race tracks can also provide instruction and coaching for drivers of all skill levels. The main priority for both track enthusiasts and race track operators is always safety—both for track drivers and others who may be physically located near the race track. As such, speed and distance are closely monitored and specialized etiquette mores—or rules of the road—must be adhered to at all times.

**C.**   **"Track-proven" vehicles operate under extreme conditions and must meet certain basic safety features to operate on a race track.**

37.     "Track-proven" Z06s routinely reach speeds in excess of 125 mph on specialized race tracks and operate under conditions that place an extreme amount of stress on Z06 systems. To keep track drivers and others safe, "track-proven" Z06s are not equipped in the same way as typical consumer Z06s. Two important differences relate to the transmission system and rear differentials in "track-proven" Z06s.

**1.**   **Transmission systems in "track-proven" vehicles**

38.     In the context of motor Z06s, a transmission system takes the power generated by the Z06's engine and applies that power to calibrate the speed and torque of the wheels. This process is accomplished by the driver shifting through different gears. Slower, or lower, gears are used to slow down the output speed of the engine and increase torque. Higher gears increase the output speed and decrease torque. Further, race track conditions often require drivers to change gears extremely quickly—usually in a tiny fraction of a second. As such, the transmission system for "track-proven" Z06s must come equipped with certain features, such as transmission coolers, to cope with the high engine speeds and fast, frequent gear shifts consistent with the rigors of track use. Without these

features, the transmission systems in Z06s, for example, will overheat, causing the vehicle to go into Limp Mode. As explained in more detail below, Limp Mode refers to a scenario where, to prevent damage, a Z06 automatically regresses to a lower RPM (revolutions per minute) with a drastically slower speed, much to the surprise of the individual driver and those driving nearby.

**2.    Differentials in "track-proven" vehicles**

39.    A rear differential is a component in all cars and is designed to compensate for the difference in distance the inner wheels and outer wheels travel as the car goes around a corner. For track drivers—who routinely turn corners while pressing on the gas in a powerful car—poor rear differentials can cause the inside wheel to start to over-spin, leading to less grip and traction. The driver then loses the ability to properly maneuver the outside wheel and can potentially lose control of the Z06. This can result in erratic driving and an increased risk for collisions.

40.    Owners of "track-proven" Z06s therefore must ensure that their rear differentials remain fully operational by allowing for the application of a specialized cooler.

**D.    The Z06 was marketed as if it could operate on race tracks because GM knew this was material to potential buyers.**

**1.    The product information materials promoted track use.**

41.    From its introduction, GM described the Z06 as fit for the track due to its superior performance technology, as explained in this 2015 vehicle information kit:

> Vehicle Highlights
>
> - All-new model enters **supercar territory with race-proven design**, advanced technologies and world-class performance
>
> - With **track-focused Z07 performance package**, 2015 Corvette Z06 delivers faster lap times than 2014 Corvette ZR1
>
> - First Corvette Z06 to offer supercharged engine, paddle-shift automatic transmission and removable roof panel for coupes, and convertible model
>
> - New LT4 supercharged 6.2L V-8 SAE-certified at 659 hp (485 kW) and 881 Nm of torque

### 2015 CORVETTE Z06 IS THE MOST
### CAPABLE CORVETTE EVER

The Z06 rejoins the Corvette lineup for 2015 as the most capable model in the iconic car's 62-year history. It stretches the performance envelope for Corvette with unprecedented levels of aerodynamic downforce – and it **is the first Corvette Z06 to offer a supercharged engine**, an eight-speed paddle-shift automatic transmission and, thanks to a stronger aluminum frame, a removable roof panel.

The new LT4 supercharged 6.2L V-8 engine is SAE-certified at 650 horsepower (485 kW) at 6,400 rpm and 650 lb-ft of torque (881 Nm) at 3,600 rpm – making the 2015 Corvette Z06 the most powerful production car ever from General Motors and one of the most powerful production cars available in the United States. With the available Z07 package, its capability enables:

- 0-60 mph acceleration in 2.95 seconds with the eight-speed automatic and 3.2 seconds with the seven-speed manual transmission
- Quarter-mile times of 10.95 seconds at 127 mph with the eight-speed and 11.2 seconds at 127 mph with the seven-speed transmission a
- Lateral acceleration of 1.2 g
- 60-0 mph braking in only 99.6 feet – the best of any production car tested by General Motors.

42.     GM's 2015 product information brochure proclaimed that it borrowed from its Racing Corvette to make the Z06 track ready:

The Corvette Z06 is a great example of the technology transfer between racing and production Corvettes," said Juechter. "First, we took what we learned on the Corvette Racing C6.R and applied that to the all-new Corvette Stingray. Then, using the Stingray as a foundation, the Z06 and C7.R were developed to **push the envelope of performance on the street and the track**.

43.     In the brochure, GM also proclaimed that it met performance targets by adding features to address cooling issues:

Practically every exterior change served a functional purpose, as this beast needed more of everything," said Tom Peters, Corvette design director. "The flared fenders accommodate larger, wider wheels and tires for more grip. **The larger vents provide more cooling air to the engine, brakes, transmission and differential for increased track capability**. The more aggressive aerodynamic package generates true downforce for more cornering grip and high-speed stability.

44.     A high-performance engine running on a track produces high temperatures that must be dealt with. GM assured consumers in its 2015 brochure that the Z06 could handle high temperatures:

> **The exterior design also reflects the increased cooling required for the new Corvette Z06. For example, the mesh pattern on the front fascia was painstakingly designed to deliver the most possible airflow to the supercharger's intercooler heat exchanger**, so much so that the mesh grill directs more air into the engine bay than if the grille was removed.
>
> **Additional cooling elements include larger front fender vents and unique air blades over the inlets on the rear fenders of Coupe models, which force about 50 percent more air into the cooling ducts for the transmission and differential coolers than those on the Stingray**. Convertible models feature under-body inlets. To cope with the additional airflow, Z06 Coupe and Convertible also have larger rear-fascia openings than the Stingray.
>
> **Standard front and rear brake-cooling ducts, including Z06-signature rear ducts integrated in front of the rear fender openings, are also part of the functional design changes over Stingray models**.

45.     To appeal to track enthusiasts, GM, in its 2015 brochure and in other promotional material claiming the Z06 was track proven, stated:

> **Track-proven structure and technologies**
>
> The 2015 Corvette Z06 leverages the technologies introduced on the Corvette Stingray, including the strategic use of lightweight materials and advanced driver technologies, with unique features and calibrations tailored for its capabilities.
>
> "Our mission with the seventh-generation Corvette was to make the performance levels more accessible, enabling drivers to exploit every pound-foot of torque, every "g" of grip and every pound of downforce," said Juechter. "It's a philosophy we introduced with the 460-horsepower Corvette Stingray – and one that's even more relevant with 650 horsepower at your beck and call."
>
> The new Z06 retains the SLA-type front and rear suspension design of the Corvette Stingray but is uniquely calibrated for the higher performance threshold. The third-generation Magnetic Selective Ride Control dampers are standard on Z06. **They can be adjusted for**

touring comfort or maximum track performance via the standard
**Driver Mode Selector**.

**2.    The features on the Z06 are those one would expect in a track-ready car.**

46.    GM sold the 2015 Z06 with three trim levels: Standard, Areo Package, and Z07
Package. The difference in trims were as follows:

- The standard Z06 features a front splitter, spats around the front
  wheel openings, a unique carbon-fiber hood with a larger vent,
  and a rear spoiler.

- An available carbon-fiber aero package – in either black or a
  visible carbon-fiber finish – adds a carbon fiber front splitter
  with aviation-style winglets, carbon fiber rocker panels, and a
  larger rear spoiler with a fixed wickerbill, which combine to
  create true aerodynamic downforce.

- The available Z07 package add larger winglets to the front
  splitter, along with an adjustable, see-through center section on
  the rear spoiler for track use. With this package, the Corvette
  Z06 delivers the most aerodynamic downforce of any
  production car GM has tested.

47.    Additionally, the Z06s were equipped with dozens of features that would suggest to a
reasonable person that the vehicles were built with the intention of occasional track use. Some of
these features included the following: an LT4 supercharged 6.2L V-8 engine with 650 horsepower at
6,400 rpm and 650 16-ft of torque at 3,600 rpm, making the Z06 "one of the most powerful
production cars ever from General Motors"; special tires to deliver the "grip needed for the Z06's
performance targets"; special steering and performance brakes; and specific software settings,
including a "Track App" and a heads-up tachometer display used for racing. Even the leather seats
were outlined with fabric to mitigate against passengers slipping and sliding in their seats while
taking corners at high speeds.

**3.    The Z06 Owner's Manual contemplates track use.**

48.    Track use is contemplated in the Owner's Manual. For example, the 2015 Z06
Owner's Manual contemplates track use:

**Track Events and Competitive Driving**

1
2
3

Participating in track events or other competitive driving without following the instructions provided may affect the vehicle warranty. See the warranty manual before using the vehicle for racing or other competitive driving.

4

**Launch Control**

5

Available only in Track mode for maximum "off-the-line" acceleration when in Competitive or PTM modes.

6
7

**Competitive Driving Mode**

8
9
10
11
12
13

If equipped, Competitive Driving Mode, Performance Traction Management, and Launch Control are systems designed to allow increased performance while accelerating and/or cornering. This is accomplished by regulating and optimizing the engine, brakes, and suspension performance. These are for use at a closed course race track and are not intended for use on public roads. They will not compensate for driver inexperience or lack of familiarity with the race track. Drivers who prefer to allow the system to have more control of the engine, brake, and suspension are advised to turn the normal traction control and StabiliTrak systems on.

14

49.    The 2016 Z06 Owner's Manual had additional provisions regarding track use:

15
16
17

**Racing/Track Brake Burnishing Procedure (Z06 with Z07 Performance Package or Z06 with J57 Ceramic Brakes)**

This procedure should only be run on a track and only on dry pavement.

18
19

**Caution**

20
21

Brake pedal fade will occur during this track burnish procedure and can cause brake pedal travel and force to increase. This could extend stopping distance until the brakes are fully burnished.

22
23

1.  Drive a normal first lap, not too aggressively.

24
25

2.  Laps 2 and 3 should be gradually driven faster and more aggressively, while allowing for reduced brake output and increased stopping distance due to brake fade.

3.  Drive Lap 4 near full speed, while allowing for reduced brake output and increased stopping distance due to brake fade.

4.  Laps 5 and 6 should be cool down laps.

5.  Lap 7 should be normal driving or an easy out lap.

**Z07 Performance Package**

The Z07 Performance Package has an installed Stage 2 Aero Package, which consists of a front splitter with short end caps, rocker panel extensions, and a rear spoiler.

Stage 3 Aero components are delivered but not installed on the vehicle. These are intended to be installed for track use only. The components include:

•   Front splitter tall end caps that replace the front splitter short end caps.

•   A center transparent wicker bill for the rear spoiler.

⚠ **Warning**

Changing the following track settings could reduce tire traction and could cause a crash. Do not change the track settings.

The track settings for the Z07 Performance Package with the Stage 3 Aero Package are:

•   The front splitter tall end caps installed.

•   The center transparent wicker bill installed all the way up on the rear spoiler.

•   The Driver Mode Selector in Track Mode.

**Stingray with Performance Package-Carbon Fiber (CFZ)**

The Stingray with Performance Package-Carbon Fiber (CFZ) has an installed aero package which consists of a front splitter with short end caps, rocker panel extensions, and a rear spoiler. A center transparent wicker bill for the rear

26
27
28

## Competitive Driving Mode

If equipped, Competitive Driving Mode, Performance Traction Management, and Launch Control are systems designed to allow increased performance while accelerating and/or cornering. This is accomplished by regulating and optimizing the engine, brakes, and suspension performance. These modes are for use at a closed course race track and are not intended for use on public roads. They will not compensate for driver inexperience or lack of familiarity with the race track. Drivers who prefer to allow the system to have more control of the engine, brake, and suspension are advised to turn the normal traction control and StabiliTrak systems on.

| Caution |
| --- |
| Attempting to shift when the drive wheels are spinning and do not have traction may cause damage to the transmission. Damage |
| (Continued) |

| Caution (Continued) |
| --- |
| caused by misuse of the vehicle is not covered by the vehicle warranty. Do not attempt to shift when the drive wheels do not have traction. |

### Competitive Driving Mode (Except Z51 and Z06 with Magnetic Ride Control)

Competitive Driving Mode allows full engine power while StabiliTrak helps maintain directional control of the vehicle by selective brake application. In this mode, TCS is off and Launch Control is available. Adjust your driving style to account for the available engine power. See "Launch Control" later in this section.



### Performance Traction Management (Z51 and Z06 with Magnetic Ride Control)

Performance Traction Management (PTM) integrates the Traction Control, StabiliTrak, and Magnetic Ride Control systems to provide improved and consistent performance when cornering. The amount of available engine power is based on the mode selected, track conditions, driver skill, and the radius of each corner.



This light is on when the vehicle is in the PTM mode.

To select this optional handling mode, the vehicle mode must be Track. Then quickly press the TCS/StabiliTrak button on the center console two times. PERF TRAC 1 - WET ACTIVE HANDLING ON displays in the DIC.

To experience the performance benefit of this system, after entering a curve and at the point where normal acceleration occurs, fully push the accelerator pedal. The PTM system will modify the level of engine power for a smooth and consistent corner exit.

The PTM system contains five modes. These modes are selected by turning the Selective Ride Control/Performance Traction Management MODE SELECT knob on the center console. Scroll up or down through modes 1–5 by turning the MODE SELECT knob to the right or left.

The following is a DIC display description and the recommended usage of each mode:

**PERF TRAC 1 – WET ACTIVE HANDLING ON**

- Intended for all driver skill levels.
- Wet or damp conditions only — not intended for use in heavy rain or standing water.
- StabiliTrak is on and engine power is reduced based on conditions.

**PERF TRAC 2 – DRY ACTIVE HANDLING ON**

- For use by less experienced drivers or while learning a new track.
- Dry conditions only.
- StabiliTrak is on and engine power is slightly reduced.

**PERF TRAC 3 – SPORT ACTIVE HANDLING ON**

- For use by drivers who are familiar with the track.
- Dry conditions only.
- Requires more driving skill than mode 2.
- StabiliTrak is on and more engine power is available than in mode 2.

**PERF TRAC 4 – SPORT ACTIVE HANDLING OFF**

- For use by drivers who are familiar with the track.
- Dry conditions only.
- Requires more driving skill than modes 2 or 3.
- StabiliTrak is off and available engine power is the same as mode 3.

**PERF TRAC 5 – RACE ACTIVE HANDLING OFF**

- For use by experienced drivers who are familiar with the track.
- Dry conditions only.
- Requires more driving skill than in other modes.
- StabiliTrak is off and engine power is available for maximum cornering speed.

Press and release the TCS/StabiliTrak button to turn off PTM and return to the traction control and StabiliTrak systems. The traction off light and StabiliTrak OFF light will go out.

**Launch Control (Track Mode Only)**

A Launch Control feature is available, within Competitive Driving Mode (except Z51 and Z06 with Magnetic Ride Control) or Performance Traction Management (Z51 and Z06 with Magnetic Ride Control), on all vehicles to allow the driver to achieve high levels of vehicle acceleration in a straight line. Launch Control is a form of traction control that manages tire spin while launching the vehicle. This feature is intended for use during closed course race events where consistent zero to 60 and quarter mile times are desirable.

Launch Control is only available when the following criteria are met:

- Competitive Driving Mode is selected (except Z51 and Z06 with Magnetic Ride Control) or any of the Performance Traction Management modes are selected (Z51 and Z06 with Magnetic Ride Control). The TCS light comes on the instrument panel and the appropriate DIC message displays.
- The vehicle is not moving.
- The steering wheel is pointing straight.

**4.      Press kits were created by GM to entice track enthusiasts to purchase a Z06.**

50.     GM also made available online, and in other forums, different press kits outlining the unique features of the Z06. These kits provided a substantial amount of detail on the Z06 as well as several specific misrepresentations that the Z06s were designed to be used on a race track. For example, the 2016 product information kit proclaimed that the Z06 was "track-proven," as had been the claim in the 2015 product kit:

> **Track-proven structure and technologies**
>
> The Corvette Z06 leverages the technologies introduced on the Corvette Stingray, including the strategic use of lightweight materials and advanced driver technologies, with unique features and calibrations tailored for its capabilities.
>
> Its aluminum frame is produced in-house at General Motors' Bowling Green assembly plant. It's the same robust, lightweight frame used on the Corvette Stingray and it is used essentially unchanged for the C7.R race cars.

51.     The kit described features that were designed for use on the track:

**Chevrolet Product Information**

The stiffer design of the aluminum frame allows the Corvette Z06 to be offered with a removable roof panel for the first time. With the lightweight, carbon fiber roof panel removed, the new Corvette Z06 offers 20 percent more structural rigidity than the previous model's fixed-roof design. It is 60 percent stiffer than the previous model with the roof panel installed.

The new Z06 retains the SLA-type front and rear suspension design of the Corvette Stingray but is uniquely calibrated for the higher performance threshold. The third-generation Magnetic Selective Ride Control dampers are standard on Z06. They can be adjusted for touring comfort or maximum track performance via the standard Driver Mode Selector.

Like the Stingray, the Driver Mode Selector tailors up to a dozen features of the Z06 to suit the driver's environment, including:

- **Launch control:** Available in Track mode for manual and automatic transmissions, providing maximum off-the-line acceleration
- **Active handling (StabiliTrak electronic stability control):** A "competitive" setting is available in Track mode and is more suited for on-track conditions. It can also be disabled, giving the driver complete control for driving in inclement conditions
- **Traction control:** Weather mode tailors traction control and engine torque for driving in inclement conditions
- **Performance Traction Management:** Available in Track mode and offers five settings of torque reduction and brake intervention for track driving
- **Electronic Limited Slip Differential:** Adjusts the rate at which the limited slip engages to balance between steering response and stability in different driving conditions with more aggressive performance in Sport and Track modes.

The smart electronic limited-slip differential, or eLSD, is standard on the Z06 to make the most of the torque split between the rear wheels. The system features a hydraulically actuated clutch that can infinitely vary clutch engagement and can respond from open to full engagement in tenths of a second. It shifts torque based on a unique algorithm that factors in vehicle speed, steering input and throttle position to improve steering feel, handling balance and traction.

**5. GM sponsored track events to demonstrate the "track-readiness" of the Z06.**

52. GM also sponsored several track events where the Z06 was prominently featured and marketed to track enthusiasts and promoted "Corvette Owner's Schools" where Corvette owners were encouraged to develop their track skills.

**E. The Z06 cannot be safely raced on the track due to design and manufacturing defects in the cooling system.**

**1. The nature of the defects and their safety consequences**

53. The performance of a car on the track is a material factor in the decision to purchase a Z06.

54. However, Z06s cannot be effectively and safely used on the track due to a defective cooling system. As a result, the engine will overheat if it operates on the track during a typical track

session, which causes the Z06 to go into Limp Mode to prevent permanent damage, or causes the driver to see the overheat gauge and pit the car before it goes into Limp Mode. Typically, Z06s in Limp Mode can immediately go from well over 100 mph to a substantially lower speed and lose power. As a result, the driver can become disoriented and lose control of the Z06, increasing the risk of an accident. This scenario is also extremely dangerous for other drivers operating at high speeds nearby who do not expect the car racing in front of them to essentially freeze on the track, thereby putting them at risk for accidents as well.

55.    The Z06s also contain a manufacturing defect in that unexpected overheating of a powertrain system can damage other essential operations of the vehicle, including the engine, clutch, rear end, and other parts. Coolers are required not only for Z06s that will be used on a race track but for all non-racing Z06s as well, because coolers are required for the purpose of preventing premature failure of the engine, drivetrain, transmission, rear differential, and other parts due to routine high temperatures not experienced in cars with coolers. Thus, track enthusiasts are faced with an impossible choice: (1) allow for overheating events to occur at unexpected times, thereby causing increased safety risks as well as damage to the engine, transmission, drivetrain, differential, and other parts of the Z06; or (2) take a gamble by modifying their car with aftermarket repairs that were not initially envisioned by GM engineers and cross their fingers that such modifications will not affect the performance or long-term reliability of their Z06, let alone the future enforcement of the GM Warranty. Under either of these scenarios, track enthusiasts are not getting what they bargained for.

56.    Frighteningly, the same Limp Mode can also unexpectedly occur on the road during non-track conditions. If Limp Mode occurs on a public highway, for example, it presents a completely distinct safety issue due to material differences in speed and the skill set of drivers on public roadways as compared to drivers on closed race tracks. Nevertheless, one thing is clear: even with the inherent differences of highway driving, a Z06 rapidly decelerating on a highway is dangerous and can result in a high-speed collision. This defect is unacceptable for customers who own a Z06.

57.     The presence of Limp Mode on public roadways is not some esoteric, distant safety issue. Not only have some plaintiffs herein alleged that they have experienced Limp Mode while on public roadways, but established publications have also reported the manifestation.

**2.     The economic consequences associated with the defects**

58.     In addition to the increased safety risks associated with the defects contained in the Z06s, Plaintiffs have also suffered economic harm as a result of GM's fraudulent conduct. First, Plaintiffs estimate that a repair to adequately correct the defects in the Z06 to make them "track-proven" would cost in excess of $20,000, including parts and labor to resolve the transmission issue only. Plaintiffs and Class members are required to pay this amount out-of-pocket as the addition of a proper cooling system is not covered under any of GM's warranties. Second, Plaintiffs and other Class members who choose not to make these aftermarket repairs lose the ability to operate their "track-proven" Z06s on a race track and risk permanent damage to the engine, transmission, drivetrain, rear differentials, and other parts. Third, the repairs suggested by GM may constitute aftermarket modifications that risk violating enforcement of the express warranties of the Z06s. Thus, they have not received that for which they have bargained.

59.     Plaintiffs have also suffered a diminution of value due to the fact that prospective owners are now aware that if they want to actually drive safely—and conform to the rules and safety habits mandated by virtually all race track organizations—they would need to pay thousands of dollars to get the same mandatory safety features that are now standard on 2017 Z06s. This additional repair, or the inability to use this "track-proven" Z06 on a race track, will factor into the purchase price and decision of prospective buyers. Moreover, the constant overheating leads to warping of the metal parts of the engine, transmission, drivetrain, and other parts. As a result, owners of the Z06s will receive less for their vehicles on the secondary market.

60.     Plaintiffs have also paid considerable sums of money above that of the MSRP for a Z06. These premiums ranged from $1,000 to more than $20,000 on top of the list price and represents further economic loss experienced by Plaintiffs.

1   **F.    GM was aware of the defects in the Z06 while marketing them as "track-proven."**

2   　　　　**1.    GM concealed the fact that the Z06 was not fit for the track.**

3   　　　　61.   In the first half of 2015, GM continued to make repeated false statements that Z06s

4   were "track-proven" and "the most track-capable car" ever produced while knowing that they were

5   unfit and unsafe for track use. Further, it is not possible that GM suddenly learned of this defect as

6   manufacturers spend a year or more testing new models. GM had been testing Z06s on the track prior

7   to introduction to the market and had to have discovered this defect. GM refused to disclose the

8   defects to the public and the fact that Z06s were unfit and unsafe for race track use during this time,

9   or that the Z06s would enter the dangerous Limp Mode if taken onto a race track and operated at

10  high speeds.

11  　　　　**2.    GM admits that the Z06's cooling system was defective.**

12  　　　　62.   GM admitted that its Z06 had a cooling defect when it halted production in 2016 to

13  find a solution to the overheating issue. GM admitted that it was responding to complaints of

14  overheating and that its solution for the 2017 model was to switch to a new hood with larger vents

15  and a new supercharger cover.

16  　　　　63.   The alleged "fix" does not help consumers with 2015 or 2016 Z06s. A third party,

17  Hennessey, offers a fix in the form of a High-Flow Heat Exchanger with a Cold Induction System

18  but at a cost of $20,000.

19  　　　　**3.    GM had knowledge of the defects from consumer complaints.**

20  　　　　64.   Manufacturers like GM have employees who monitor internet forums and other

21  places where consumers discuss dissatisfaction. GM monitored forums about the Z06 and knew from

22  product launch about the overheating issue, and it was aware of the issue as shown below.

23  　　　　65.   On or about February 22, 2015, Tadge Juechter (Corvette's Chief Engineer) stated the

24  following, acknowledging GM's awareness of the overheating problem in the Z06s:

25  　　　　　　　　The Z06 Automatic transmission put in "Drive" selects the lowest
　　　　　　　　possible gear ratio for best acceleration, and because it has 8 closely-
26  　　　　　　　spaced ratios typically runs higher average RPM than the manual. This
　　　　　　　　optimizes lap time performance, but also taxes the engine oil and
27  　　　　　　　coolant more for any given track. So the automatic has the capability to
　　　　　　　　run faster laps than the manual, but thermal limitations are reached
28

more quickly. Customers who are planning to run extended track-day sessions at 'professional' speeds, are advised to go with the manual transmission, or to paddle shift the automatic and select higher gears when conditions warrant it.

Any time the maximum recommended temperatures are reached in any condition, the DIC will give warnings at the appropriate time for coolant, oil, or transmission fluid. A cool-down lap or two will bring operating temperatures back to a reasonable level and aggressive track driving can be resumed.

Some may wonder why don't we design to higher temperatures, say 110 degrees, to accommodate southern tracks in the Summer. We have used the "pro driver at 86 degrees" criteria for generations of Corvettes and for the vast majority of customers, it has resulted in excellent performance for their usage. If we designed to higher temperature criteria, we would have to add a lot of cooling hardware which drives mass up and perhaps more importantly, you have to feed the system with more air which has a huge impact on appearance and aerodynamic drag. Like most aspects of car design, the challenge is in finding the best balance of conflicting requirements.

66.    One forum GM closely monitored was "StingrayForums.com." The following is one example of a complaint that GM was aware of, which was posted in May 2014:



67.     The following is another complaint, posted in 2015 on a forum that GM monitored, commenting on "many" reports of overheating:

Question:
Does GM have any plan to sell a cooling pack in the future for the C7 chassis? Is it even a possibility, and if so, what would it look like?

Background
The limitations of the radiator and related parts that help the car stabilize oil and water/coolant temperature are easily reached when the C7 Z06 is driven aggressively (such as on a track at an HPDE event). There are now many reports from owners overheating the cars in 80 degree weather or even in 70 degree weather. This limitation of the car as sold will be exacerbated in the coming summer months. Many media outlets have reported overheating. This includes every occurrence when Motor Trend tested the C7 Z06 and during daily driving the C7 Stingray by Edmunds. See here:
http://www.edmunds.com/chevrolet/cor...tain-road.html

The commonly displayed overheating message is "Engine Overheating, A/C has been turned off, please idle engine." Coolant temperatures in particular quickly approach 257 degrees which prompt the computer to issue a warning in the center display.

Other manufacturers offer such an optional package to effectively cool the car. See for example the new Shelby GT350 Track Pack is described as follows: "optional with the Track Pack, an engine oil cooler and a transmission cooler."

https://media.ford.com/content/fordm...0-mustang.html

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

68.     The following is another forum post on StingrayForums.com:



69.     In the summer of 2015, GM was aware of the overheating issue and issued a forum post telling Z06 owners that the car was built to race in temperatures up to 86°F and that a higher temperature "affects all cars['] abilities to run sustained laps." The following is a post on Stingrayforums.com where a consumer states in response:



> Does the US dealers have the same bulletin? Anyway, it seems that GM is telling us to shut-up!
>
> Sorry if it is a repost but I couldn't find it in this thread...

That's Brillant! The car was really built for running the 1/4 mile, all that stage 3, carbon brakes etc are a gimmick to get more money out of the consumer. The car is even overheating in the Pacific Northwest which should never happen.

REPLY

08-11-2015, 10:55 PM                                                                    #4047

**hyteck9**
CF Senior Member
★ ★ ★

Member Since: Aug 2009
Location: Columbus OH
Posts: 933
Thanks: 0
Thanked 2 Times in 1 Post

I'm sad.
Even more sad it also relates to the 2016's too, so no fix coming...

REPLY

08-12-2015, 01:41 AM                                                                    #4048

**Dabigsnake**
CF Senior Member
★ ★ ★

Gold Member

Member Since: Nov 2014
Posts: 649
Thanks: 151
Thanked 87 Times in 53 Posts

Would have been nice to have this new info from GM before I made the A8 decision. Shame shame. Very disappointing.
I certainly would have bought an M7 car. Wonder if GM would like to swap out my car for an M7? Or anybody out there? Paid $108,000 for my loaded 07, comp seats, etc etc.

REPLY

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15

70.    The following is a May 22, 2015 forum post regarding overheating in the Z06:

16
17
18
19
20
21



22

71.    The following is a forum post concerning "the mammoth overheating problem":

23
24
25
26
27
28

*13 THOUGHTS ON "2015 CHEVY CORVETTE Z06: OVERHEATING ISSUE. IS IT THE 8-SPEED TRANSMISSION'S FAULT?"*

September 30, 2015 at 7:47 pm

Art Woosley

The overheat issue and worse is squarely sitting on the narrow shoulders of Chevrolet. The know only to well that the Z06 engine was a bomb waiting to explode and suffers mammoth overheating problem. Was the problem addressed before the car was released? Hell NO! Chevrolet decided to disregard and disrespect the valued customer and instead worship the dollar. I am FINISHED with Chevy and am finished with the GM vendetta on consumers.

GM = GREAT MISTAKE

72.     The following is a post suggesting that the problem deserves a class action:

June 1, 2016 at 4:54 pm

Robert Kennedy

I recently bought a 2016 Corvette Z06 C7.R Edition. 1st open track day, 1st run, 12 minutes in, oil temp goes to 320 deg. and alarms go off on the dash. I immediately slow down and the alarms stop and oil temp comes down slowly but my track day is done and any other future track days. I'm very disappointed with this vehicle given how GM is advertising the vehicle. I'm now exploring aftermarket options to correct this problem. My understanding is there are other owners of this vehicle experiencing the same problem therefore we should come together and start a class action lawsuit against GM.

73.     GM was aware of the continuous series of complaints, like those above, that continued to be posted on various online forums.

**G.     Despite express warranties, GM has not fixed the problems with the "track-proven" powertrain system.**

74.     In connection with the sale (by purchase or lease) of its new Z06s, GM provides an express limited warranty on each Z06 (the "GM Warranty"). In the warranty, GM promises to repair any defect or malfunction that arises in the Z06 during a defined period of time. This warranty is provided by GM to Z06 owners in writing and regardless of what state the Z06 was purchased in.

75.     Each plaintiff was provided the GM Warranty, which was the basis of the purchase of their Z06s.

76.     In the GM Warranty and in advertisements, brochures, press kits, and other statements in the media, GM expressly warranted that it would repair "any vehicle defect" that becomes

apparent during the warranty period. The following uniform GM Warranty appears in all Chevrolet Warranty Guides:[1]

> GM will provide for repairs to the vehicle during the warranty period in accordance with the following terms, conditions, and limitations.

> **What is Covered**

> **Warranty Applies**

> This warranty is for GM vehicles registered in the United States and normally operated in the United States or Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

> **Repairs Covered**

> The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

> **No Charge**

> Warranty repairs, including towing, parts, and labor, will be made at no charge.

77.     With regard to the Corvette Z06, the duration of the limited warranty for bumper-to-bumper protection is three years or 36,000 miles, whichever occurs first. The powertrain warranty is five years or 56,000 miles, whichever occurs first. The "warranty period . . . begins on the date the vehicle is first delivered or put in use."[2] These terms were identical for all Z06s.

78.     Plaintiffs and Class members all experienced defects in their powertrain systems within the warranty period. However, despite the existence of the express warranties provided to Plaintiffs and Class members, GM has failed to honor the terms of the warranties by failing to, "at no charge," repair to correct the defect.[3]

---

[1] *2016 Chevrolet Limited Warranty and Owner Assistance Information*, available at https://my.chevrolet.com/content/dam/gmownercenter/gmna/dynamic/manuals/2016/Chevrolet/Multi-Model%20PDFs/2k16chevylimitedwty3rdPrint.pdf, at p. 4.

[2] *Id.*

[3] *Id.*

79.     Thus, it is impossible for owners to seek relief, even at their own expense, and still maintain the validity of their express warranty.

## VI.     CLASS ALLEGATIONS

80.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities who purchased or leased a 2015-2017 Chevrolet Corvette Z06 in or from the State of California (the "Class").

81.     Excluded from the Class are individuals who have personal injury claims resulting from the operation of a Z06. Also excluded from the Class are General Motors LLC and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

82.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

83.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

84.     Numerosity. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are substantially more than 100 Class members, the precise number of Class members is unknown to Plaintiffs but may be ascertained from GM's books and records. At present, Plaintiffs allege nationwide sales of 8,653 2015 Z06s, 14,275 2016 Z06s, and over 10,000 2017 Z06s. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, email, Internet postings, and/or published notice.

85.    <u>Commonality and Predominance</u>: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a)    Whether GM engaged in the conduct alleged herein;

b)    Whether GM designed, advertised, marketed, distributed, leased, sold, or otherwise placed Z06s into the stream of commerce in the United States;

c)    Whether the Z06 contains defects;

d)    Whether such defects cause the Z06 to malfunction;

e)    Whether GM knew about the defects and, if so, how long GM has known of the defects;

f)    Whether GM designed, manufactured, marketed, and distributed Z06s with a defective "track-proven" powertrain system;

g)    Whether GM's conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

h)    Whether GM knew or should have known that the defects existed with regard to the Z06;

i)    Whether GM knew or reasonably should have known of the defects in the Z06 before it sold or leased them to Class members;

j)    Whether Plaintiffs and the other Class members overpaid for their Z06s as a result of the defects alleged herein;

k)    Whether Plaintiffs and the other Class members are entitled to equitable relief; and

l)    Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

86.    <u>Typicality</u>: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through GM's wrongful conduct as described above.

87.    <u>Adequacy</u>: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the Class; Plaintiffs have retained counsel competent and experienced in complex class action litigation;

1    and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and

2    adequately protected by Plaintiffs and their counsel.

3           88.    <u>Declaratory and Injunctive Relief</u>: Federal Rule of Civil Procedure 23(b)(2): GM has

4    acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the

5    Class, thereby making appropriate final injunctive relief and declaratory relief, as described below,

6    with respect to the Class as a whole.

7           89.    <u>Superiority</u>: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to

8    any other available means for the fair and efficient adjudication of this controversy and no unusual

9    difficulties are likely to be encountered in the management of this class action. The damages or other

10   financial detriment suffered by Plaintiffs and the other Class members are relatively small compared

11   to the burden and expense that would be required to individually litigate their claims against GM, so

12   it would be impracticable for Class members to individually seek redress for GM's wrongful

13   conduct. Even if Class members could afford individual litigation, the court system could not.

14   Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases

15   the delay and expense to all parties and the court system. By contrast, the class action device presents

16   far fewer management difficulties and provides the benefits of single adjudication, economy of scale,

17   and comprehensive supervision by a single court.

### VII.    CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301 *ET SEQ.*)

21          90.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

22   herein.

23          91.    Plaintiffs bring this claim on behalf of themselves and the Class.

24          92.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act,

25   15 U.S.C. § 2301(3).

26          93.    GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss

27   Warranty Act, 15 U.S.C. § 2301(4)-(5).

94.     The Z06 is a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

95.     15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

96.     GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

97.     GM breached these warranties as described in more detail above. Without limitation, the Z06 is equipped with a defective "track-proven" powertrain system. The Z06s share a common design defect in that the system fails to operate as represented by GM.

98.     Plaintiffs and the other Class members have had sufficient direct dealings with either GM or its agents to establish privity of contract between GM on one hand and Plaintiffs and each of the other Class members on the other hand. GM-authorized dealerships and technical support organizations operating under contract to GM are agents of GM. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the consumers only.

99.     Giving GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Plaintiffs have already done so and GM has failed, after numerous attempts, to cure the defects. As explained above, any solution offered by GM must be exclusively paid for by Plaintiffs and Class members, which is a violation of GM's promise to repair and replace without charge. All solutions offered by GM are also aftermarket alterations and therefore undertaking these repairs may represent a new violation of the express warranties on the part of Plaintiffs and Class members. At the time of sale or lease of each Z06, GM knew, should have known, or was reckless in not knowing, of its omissions and/or misrepresentations concerning the Z06's inability to perform as warranted, but it nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal

1   dispute resolution procedure and/or give GM a reasonable opportunity to cure its breach of

2   warranties is excused and thereby deemed satisfied.

3         100.    Plaintiffs and the other Class members would suffer economic hardship if they

4   returned their Z06s but did not receive the return of all payments made by them. Because GM is

5   refusing to acknowledge any revocation of acceptance and return immediately any payments made,

6   Plaintiffs and the other Class members have not re-accepted their Z06s by retaining them.

7         101.    Plaintiffs, individually and on behalf of the other Class members, seek all damages

8   permitted by law, including diminution in value of the Z06s and/or loss of the benefit of the bargain,

9   in an amount to be proven at trial.

10                     **COUNT TWO**

11
12
   **VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR
BREACH OF EXPRESS WARRANTY (CAL. CIV. CODE §§ 1791.2 & 1793.2(d))
AND BREACH OF COMMON-LAW EXPRESS WARRANTY**

13         102.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

14   herein.

15         103.    Plaintiffs bring this claim on behalf of themselves and the Class.

16         104.    Plaintiffs and the other Class members who purchased or leased the Z06s in Califor-

17   nia are "buyers" within the meaning of CAL. CIV. CODE § 1791(b) and "lessees" within the meaning

18   of CAL. CIV. CODE § 1791(g).

19         105.    The Z06s are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

20         106.    GM is a "manufacturer" of the Z06s within the meaning of CAL. CIV. CODE § 1791(j).

21         107.    Plaintiffs and the other Class members bought or leased new motor vehicles

22   manufactured by GM.

23         108.    GM provided an express warranty—the GM Warranty—to Plaintiffs and the other

24   Class members within the meaning of CAL. CIV. CODE §§ 1791.2 and 1793.2, as described above.

25         109.    The GM Warranty expressly warrants that GM will repair "any vehicle defect" that

26   becomes apparent during the warranty period.

27         110.    As set forth above in detail, the Z06s are inherently defective in that there are defects

28   in the Z06's "track-proven" powertrain systems as they are not equipped with a transmission cooler

and rear differential cooler, leading to overheating of the powertrain system, damage to other systems within the vehicle, and vehicles unexpectedly going into Limp Mode—a dangerous scenario that significantly increases the likelihood of collisions both on the race track and on public highways. These defects were (and continue to be) covered by the GM Warranty, and these defects substantially impair the use, value, and safety of GM's Z06s to reasonable consumers like Plaintiffs and the other Class members.

111.    Plaintiffs notified GM and/or its agents of the need for repairs prior to starting this lawsuit.

112.    GM did not promptly replace or buy back the Z06s of Plaintiffs and the other Class members.

113.    As a result of GM's breach of its warranty, Plaintiffs and the other Class members received goods whose dangerous condition substantially impairs their value to Plaintiffs and the other Class members. Plaintiffs and the other Class members have been damaged as a result of the diminished value of GM's products, the products' malfunctioning, and the nonuse of their Z06s.

114.    Under common law and CAL. CIV. CODE §§ 1793.2 & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Z06s or the overpayment or diminution in value of their Z06s.

115.    Under CAL. CIV. CODE § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

## COUNT THREE

## FRAUDULENT CONCEALMENT

116.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

117.    Plaintiffs bring this claim on behalf of themselves and the Class.

118.    GM intentionally concealed that the defects contained in the "track-proven" powertrain system render Z06s unfit for track use, in that the transmissions of these vehicles would overheat when placed under track conditions and unexpectedly go into Limp Mode after less than fifteen minutes, creating a dangerous hazard not only to the drivers, but also to nearby racing

vehicles. GM concealed the fact that the only way for the Z06s to become "track-proven" as advertised was for GM owners to buy rear differential and transmission coolers for vehicles—at their own expense and potentially in violation of their express warranties.

119.     GM further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Z06 it was selling had no significant defects, and that all Z06s were "track-proven."

120.     GM knew about the defects in the "track-proven" powertrain system when these representations were made.

121.     The Z06s purchased by Plaintiffs and the other Class members contained a defective "track-proven" powertrain system.

122.     GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiffs and the other Class members relied on GM's material representations.

123.     As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the "track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defect and that Plaintiffs and other Class members would be required to make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

124.     The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiffs and the other Class members did not know of these facts and GM actively concealed these facts from Plaintiffs and the other Class members.

125.     Plaintiffs and the other Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiffs and the other Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiffs and the other Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

126.     GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the vehicles and forced Plaintiffs and the other Class members to make additional expenditures to ensure proper safety at the race track.

127.     GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiffs or the other Class members.

128.     GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the vehicle.

129.     GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiffs and the other Class members.

130.     GM has still not made full and adequate disclosures and continues to defraud Plaintiffs and the other Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

131.     Plaintiffs and the other Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the other Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiffs, or other Class members.

132.    Because of the concealment and/or suppression of facts, Plaintiffs and the other Class members sustained damage because they own(ed) vehicles that are diminished in value as a result of GM's concealment of the true quality of those vehicles' "track-proven" powertrain systems. Had Plaintiffs and the other Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiffs and the other Class members who purchased a Z06 would have paid less for their vehicles or would not have purchased them at all.

133.    The value of Plaintiffs' and the other Class members' vehicles has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the vehicles.

134.    Accordingly, GM is liable to Plaintiffs and the other Class members for damages in an amount to be proven at trial.

135.    GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Class members' rights and the representations that GM made to them, in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FOUR

## UNJUST ENRICHMENT

136.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

137.    Plaintiffs bring this claim on behalf of themselves and the Class.

138.    GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein. GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

139.    GM has voluntarily accepted and retained this benefit.

140.    The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

141.    Plaintiffs and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT FIVE

### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

142.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

143.    Plaintiffs bring this claim on behalf of themselves and the Class.

144.    California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

145.    GM's conduct, as described herein, was and is in violation of the UCL. GM's conduct violates the UCL in at least the following ways:

i.      By knowingly and intentionally concealing from Plaintiffs and the other Class members that the Z06s suffer from defects while obtaining money from Plaintiffs and Class members;

ii.     By marketing Z06s as being useable on a track;

iii.    By failing to disclose that the Z06's "track-proven" powertrain system is defective as it is not equipped with a transmission cooler and rear differential cooler, leading to overheating of the powertrain system and the Z06s unexpectedly going into Limp Mode—a dangerous scenario that significantly increases the likelihood of collisions both on the race track and on public highways;

iv.     By refusing or otherwise failing to repair and/or replace defective Z06s;

v.      By violating federal laws, including the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301; and

vi.    By violating other California laws, including CAL. CIV. CODE §§ 1709, 1710, and 1750 *et seq.*, and CAL. COM. CODE § 2313.

146.    GM's omissions and/or misrepresentations alleged herein caused Plaintiffs and the other Class members to make their purchases or leases of their Z06s. Absent those omissions and/or misrepresentations, Plaintiffs and the other Class members would not have purchased or leased these Z06s, would not have purchased or leased these Z06s at the prices they paid, and/or would have purchased or leased less expensive alternative Z06s that clearly indicated that they were not for track use.

147.    Accordingly, Plaintiffs and the other Class members have suffered injury in fact, including lost money or property, as a result of GM's misrepresentations and omissions.

148.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by GM under CAL. BUS. & PROF. CODE § 17200.

149.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin GM from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345; and for such other relief set forth below.

## COUNT SIX

### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*)

150.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

151.    Plaintiffs bring this claim on behalf of themselves and the Class.

152.    CAL. BUS. & PROF. CODE § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet,

1   any statement … which is untrue or misleading, and which is known, or which by the exercise of

2   reasonable care should be known, to be untrue or misleading."

3          153.    GM has violated CAL. BUS. & PROF. CODE § 17500 because the omissions and/or

4   misrepresentations regarding the safety, reliability, and functionality of its Z06s as set forth in this

5   Complaint were material and likely to deceive a reasonable consumer.

6          154.    Plaintiffs and the other Class members have suffered an injury in fact, including the

7   loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices. In

8   purchasing or leasing their Z06s, Plaintiffs and the other Class members relied on the omissions

9   and/or misrepresentations of GM with respect to the safety and reliability of the Z06s. GM's

10  representations turned out not to be true because the Z06s have "track-proven" powertrain systems

11  that are defective as they are not equipped with a transmission cooler and rear differential cooler,

12  leading to overheating of the powertrain system and the Z06s unexpectedly going into Limp Mode—

13  a dangerous scenario that significantly increases the likelihood of collisions both on the race track

14  and on public highways. Had Plaintiffs and the other Class members known this, they would not

15  have purchased or leased their Z06s and/or paid as much for them. Accordingly, Plaintiffs and the

16  other Class members overpaid for their Z06s and did not receive the benefit of their bargain.

17         155.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the

18  conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of

19  conduct that is still perpetuated and repeated, both in the State of California and nationwide.

20         156.    Plaintiffs, individually and on behalf of the other Class members, request that this

21  Court enter such orders or judgments as may be necessary to enjoin GM from continuing its unfair,

22  unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class members any

23  money GM acquired by unfair competition, including restitution and/or restitutionary disgorgement,

24  and for such other relief set forth below.

25

26

27

28

**COUNT SEVEN**

**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
(CAL. CIV. CODE § 1750 *ET SEQ.*)**

157.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

158.    Plaintiffs bring this claim on behalf of themselves and the Class.

159.    California's Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750 *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

160.    The Z06s are "goods" as defined in CAL. CIV. CODE § 1761(a).

161.    Plaintiffs and the other Class members are "consumers" as defined in CAL. CIV. CODE § 1761(d), and Plaintiffs, the other Class members, and GM are "persons" as defined in CAL. CIV. CODE § 1761(c).

162.    In purchasing or leasing the Z06s, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the Z06's "track-proven" powertrain systems are defective as they are not equipped with a transmission cooler and rear differential cooler, leading to overheating of the powertrain system and the Z06s unexpectedly going into Limp Mode—a dangerous scenario that significantly increases the likelihood of collisions both on the race track and on public highways.

163.    GM's conduct, as described hereinabove, was and is in violation of the CLRA. GM's conduct violates at least CAL. CIV. CODE § 1770(a)(16) (representing that goods have been supplied in accordance with a previous representation when they have not).

164.    Plaintiffs and the other Class members have suffered injury in fact and actual damages resulting from GM's material omissions and/or misrepresentations because they paid an inflated purchase or lease price for the Z06s.

165.    GM knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the Z06s and that the Z06s were not suitable for their intended use.

166.    The facts concealed and omitted by GM to Plaintiffs and the other Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Z06s or pay a lower price. Had Plaintiffs and the other Class members known about the defective nature of the Z06s and their inability to operate these Z06s safely on a race track, they would not have purchased or leased the Z06s or would not have paid the prices they paid in fact.

167.    Plaintiffs have provided GM with notice of its violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a). The notice was transmitted to GM on June 9, 2017, and again on October 24, 2017.

168.    Plaintiffs' and the other Class members' injuries were proximately caused by GM's fraudulent and deceptive business practices.

169.    Therefore, Plaintiffs and the other Class members are entitled to equitable relief and will amend this action and seek monetary relief under the CLRA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against General Motors, as follows:

A.    Certification of the Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.    An order temporarily and permanently enjoining General Motors from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Injunctive relief in the form of a recall or free replacement program;

D.    Injunctive relief in the form of a buy back;

E.    Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

F.    An order requiring General Motors to pay both pre- and post-judgment interest on any amounts awarded;

G.    An award of costs and attorneys' fees; and

1

H.     Such other or further relief as may be appropriate.

2

**DEMAND FOR JURY TRIAL**

3

Plaintiffs hereby demand a jury trial for all claims so triable.

4

Dated: October 30, 2017                    Respectfully Submitted,

5

6                                          By: */s/ Shana E. Scarlett*
                                               Shana E. Scarlett (SBN 217895)
7                                          HAGENS BERMAN SOBOL SHAPIRO LLP
                                           715 Hearst Avenue, Suite 202
8                                          Berkeley, CA 94710
                                           Telephone: (510) 725-3000
9                                          Facsimile: (510) 725-3001
                                           shanas@hbsslaw.com

10                                         Steve W. Berman (*pro hac vice forthcoming*)
                                           Shelby Smith (*pro hac vice forthcoming*)
11                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                           1918 Eighth Avenue, Suite 3300
12                                         Seattle, WA 98101
                                           Telephone: (206) 623-7292
13                                         Facsimile: (206) 623-0594
                                           Email: steve@hbsslaw.com
14                                         Email: shelbys@hbsslaw.com

15                                         Stuart Z. Grossman
                                           Rachel Furst
16                                         GROSSMAN ROTH YAFFA COHEN
                                           2525 Ponce de Leon, Suite 1150
17                                         Coral Gables, FL 33134
                                           Telephone: (888) 296-1681
18                                         Facsimile: (305) 285-1668
                                           Email: szg@grossmanroth.com
19                                         Email: rwf@grossmanroth.com

20                                         Jason D. Weisser
                                           SCHULER, HALVORSEN, WEISSER, ZOLLER & OVERBECK
21                                         1615 Forum Place, Suite 4
                                           West Palm Beach, FL 33401
22                                         Telephone: (561) 689-9180
                                           Facsimile: (561) 684-9683
23                                         Email: jweisser@shw-law.com

24                                         *Attorneys for Plaintiffs and the Proposed Class*

25

26

27

28